# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF MIAMI GENERAL EMPLOYEES' AND SANITATION EMPLOYEES' RETIREMENT TRUST, on behalf of itself and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9980-CB |
| C&J ENERGY SERVICES, INC., JERRY M. COMSTOCK, JR., as Independent Executor of the Estate of Joshua E. Comstock, RANDALL C. MCMULLEN, DARREN M. FRIEDMAN, ADRIANNA MA, MICHAEL ROEMER, C. JAMES STEWART, III, H.H. "TRIPP" WOMMACK, III, THEODORE "TED" MOORE, NABORS INDUSTRIES LTD., and NABORS RED LION LIMITED, and MORGAN STANLEY & CO. LLC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: October 13, 2017
Date Decided: January 23, 2018

Stuart M. Grant and Mary S. Thomas, GRANT & EISENHOFER P.A., Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen, and Christopher J. Orrico, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York, *Attorneys for Plaintiff*.

Stephen C. Norman, Michael A. Pittenger, and Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael C. Holmes, Craig E. Zieminski, Olivia D. Howe, and Meriwether Evans, VINSON & ELKINS LLP, Dallas, Texas, *Attorneys for Defendants C&J Energy Services, Inc., Jerry M. Comstock, Jr., as Independent Executor of the Estate of Joshua E. Comstock, Randall C. McMullen, Darren M. Friedman, Adrianna Ma, Michael Roemer, C. James Stewart, III, H.H. "Tripp" Wommack, III, and Theodore "Ted" Moore.*

William M. Lafferty, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Defendants Nabors Industries Ltd. and Nabors Red Lion Limited.*


**BOUCHARD, C.**

In this case, a stockholder of C&J Energy Services, Inc. ("C&J Inc.") seeks an award of $5 million in attorneys' fees for plaintiff's alleged role in reducing the amount of cash that C&J Inc. needed to pay Nabors Industries Ltd. ("Nabors") in connection with a transaction that closed in March 2015. The beneficiary of the price reduction was C&J Inc. and, indirectly, all of its stockholders.

Defendants vigorously dispute that plaintiff's complaint had any merit when it was filed or that its lawsuit caused the price reduction in any way. According to defendants, the sole reason the C&J Inc. board negotiated for the price reduction was to secure stockholder approval of the transaction, which was threatened because of a dramatic decline in oil and natural gas prices that impacted the economic merits of the transaction after it was originally negotiated.

Plaintiff's application also arises in an odd posture. It was filed after C&J Inc. went through a bankruptcy proceeding discharging it from any potential liability for a fee award. As a result, plaintiff asks the court to require that the estate of Joshua Comstock pay the full amount of any fee award. Before his untimely death, Comstock was C&J Inc.'s CEO and Chairman of the Board, who owned approximately 11% of C&J Inc.'s shares before the transaction and who was plaintiff's primary target in this litigation. Thus, plaintiff's application presents a novel question: whether a plaintiff may target a particular stockholder or subset of

1

stockholders to pay a fee award when the alleged benefit redounded to the benefit of all stockholders.

For the reasons discussed below, I conclude that plaintiff's fee application must be denied for two independent reasons: (1) because defendants successfully rebutted the presumption that plaintiff's litigation efforts caused the price reduction, and (2) because plaintiff's demand that Comstock's estate (or any of C&J Inc.'s other directors) pay a fee award is inconsistent with the rationale of the corporate benefit doctrine and would be inequitable.

## I.    BACKGROUND

The factual background and procedural history of this litigation are discussed in detail in earlier opinions of the Delaware Supreme Court and this court.[1]  The court assumes the reader's familiarity with those opinions and recites below only those facts directly relevant to the pending motion.

On June 25, 2014, C&J Inc. and Nabors entered into a merger agreement to combine C&J Inc. with certain business segments of Nabors.  The transaction was structured as a merger between C&J Inc. and a wholly-owned subsidiary of Nabors Red Lion Limited, which was wholly-owned by Nabors.  C&J Inc. was the surviving

---

[1] *See C&J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049 (Del. 2014); *City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr. v. Comstock*, 2016 WL 4464156, at *7 (Del. Ch. Aug. 24, 2016), *aff'd.* 158 A.3d 885 (Del. 2017).

2

entity of the merger. Nabors Red Lion Limited was renamed C&J Energy Services, Ltd. ("C&J Ltd.") after the merger.[2] Under the original terms of the proposed transaction, Nabors was to receive approximately $938 million in cash from C&J Inc. and approximately 53% of the shares of C&J Ltd., and the public stockholders of C&J Inc. were to receive approximately 47% of the shares of C&J Ltd. The relationship between the relevant entities after the merger is depicted below in simplified form:



On July 30, 2014, plaintiff filed its original complaint, asserting that C&J Inc.'s directors breached their fiduciary duties in negotiating and approving the proposed transaction with Nabors. The named defendants were C&J Inc., the seven

---

[2] After emerging from bankruptcy in 2016, C&J Inc. became CJ Spec-Rent Services, Inc., and C&J Ltd. was renamed C&J Energy Services, Inc. This decision does not refer to those post-bankruptcy entity names.

3

members of its board, its Executive Vice President and General Counsel, Nabors, and Nabors Red Lion Limited, which became C&J Ltd. after the merger.[3]

On November 25, 2014, the court issued a preliminary injunction enjoining the proposed transaction from closing until after C&J Inc. solicited alternative proposals to purchase the company during a thirty-day period. A special committee of the C&J Inc. board was formed to undertake the solicitation process. During that process, on December 11, 2014, Cerberus Capital Management made a proposal to combine C&J Inc. with Keane Energy, one of Cerberus' portfolio companies.

On December 18, 2014, during a special meeting of the C&J Inc. board, certain directors asked Comstock to provide an update on "any attempts to negotiate a reduction in the purchase price [of the Nabors transaction] in light of changing market conditions."[4] The board minutes state that "Mr. Comstock explained that he had initiated such negotiations with Nabors and anticipated additional discussions prior to an agreement on any reduction in purchase price."[5] The next day, on December 19, 2014, the Delaware Supreme Court reversed the Court of Chancery's decision and lifted the preliminary injunction, reinstating the no-shop provision in the merger agreement.

---

[3] Comstock passed away on March 11, 2016. On June 2, 2016, his estate's executor (Jerry M. Comstock, Jr.) was substituted as a party defendant in his place. Dkt. 301.

[4] Defs.' Opp'n Br. Ex. D at 2.

[5] *Id.*

On February 6, 2015, C&J Inc. and Nabors reached an agreement to reduce the cash portion of the consideration C&J Inc. would pay to Nabors by $250 million ("Price Reduction"), from approximately $938 million to $688 million. The proxy statement for the proposed transaction explained the circumstances surrounding the Price Reduction, as follows:

> Following significant dislocation in oil and natural gas prices that began in late 2014 and continued into 2015, and as a result of concerns that C&J shareholders would not support the Transactions on the terms set forth in the Original Merger Agreement and Original Separation Agreement in light of such price changes, in late 2014, Messrs. Petrello and Comstock entered into discussions with respect to a restructuring of the Transaction that would reduce the amount of cash paid to Nabors at closing. Discussions continued through February 2015.[6]

After receiving the approval of over 97% of the C&J Inc. stockholders who voted, the transaction closed in March 2015.

Over the next seven months after the transaction closed, plaintiff made little effort to advance its claims. The primary activity during this period concerned defendants' efforts to collect damages against a $650,000 bond plaintiff had posted as a condition to entry of the preliminary injunction.

On October 29, 2015, plaintiff amended its complaint. On August 24, 2016, the court granted defendants' motions (i) to dismiss the amended complaint and (ii) to recover approximately $542,000 in damages against the injunction bond.

---

[6] Defs.' Opp'n Br. Ex. G at 74.

In the meantime, on July 20, 2016, C&J Inc., C&J Ltd., and certain other affiliated entities (the "Debtors") filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Texas. On September 25, 2016, the bankruptcy court entered an order setting November 8, 2016 as the bar date for submitting proofs of claim for any "claim against the Debtors that arose before the Petition Date," *i.e.*, before July 20, 2016.[7] The order further provides that any person "who is required, but fails, to file a Proof of Claim in accordance with the Bar Date order on or before the applicable Bar Date shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors" and that "the Debtors and their property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim."[8]

Plaintiff's fee claim accrued in February 2015, when the Price Reduction was secured.[9] Accordingly, plaintiff was required to file a proof of claim by November 8, 2016 if it wished to obtain a recovery for its fee claim from C&J Inc. or C&J Ltd. It is undisputed that plaintiff never filed such a proof of claim.

On December 9, 2016, plaintiff informed the bankruptcy court that it was not objecting to the confirmation of a proposed plan of reorganization but was reserving

---

[7] Defs.' Opp'n Br. Ex. J ¶¶ 2-3. The bar date order contained certain exceptions not relevant here.

[8] Defs.' Opp'n Br. Ex. J ¶ 17.

[9] *See* Pl.'s Opening Br. 21 (seeking fees for hours worked until February 9, 2015).

6

its rights "with respect to pursuing any claims against defendants in [this action] other than the Debtors, the Reorganized Debtors, or their Estates."[10] On December 16, 2016, the bankruptcy court approved the proposed plan of reorganization, discharging the Debtors of any responsibility for plaintiff's fee application.[11]

On March 23, 2017, the Delaware Supreme Court affirmed this court's dismissal of plaintiff's amended complaint and its grant of defendants' motion to recover damages against the injunction bond. On April 7, 2017, plaintiff filed the present motion for an award of attorneys' fees and expenses.

On October 13, 2017, the court heard argument on plaintiff's application for a fee award and on defendants' request for release of the balance of the injunction bond.[12] At the conclusion of the hearing, the court ruled in defendants' favor concerning the injunction bond, and took the fee application under advisement.

---

[10] Defs.' Opp'n Br. Ex. L ¶¶ 1, 5.

[11] "[E]xcept as otherwise specifically provided in the Plan or in any contract, . . . the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims [or] Causes of Action of any nature whatsoever, . . . liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors . . ." Defs.' Opp'n Br. Ex. M at VIII.A.

[12] Plaintiff continued to oppose the release of the bond notwithstanding this court's earlier grant of defendants' motion to recover against the bond and the Supreme Court's affirmance of that decision.

7

## II. ANALYSIS

Plaintiff contends that it is entitled to a $5 million fee award for playing a role in causing the Price Reduction. According to plaintiff, its "original complaint created the pressure that led to the injunction, the solicitation process and [the] Cerberus Bid that played a role in the Price Reduction and the improvement of the Merger terms."[13] In plaintiff's view, the $250 million Price Reduction is "akin to a common fund," the creation of which entitles plaintiff to receive compensation for its litigation efforts.[14]

The "common fund" and "corporate benefit" doctrines are two well-recognized exceptions to the American Rule, under which a prevailing party is responsible for paying its own counsel fees. "Under the common fund doctrine, 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'"[15] "'[T]he corporate benefit doctrine comes into play when a tangible monetary benefit has not been conferred,' but some other valuable benefit is realized

---

[13] Pl.'s Reply Br. 9-10.

[14] Pl.'s Opening Br. 19.

[15] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1252-53 (Del. 2012) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)); *see also In re Dunkin' Donuts S'holders Litig.,* 1990 WL 189120, at *3 (Del. Ch. Nov. 27, 1990) ("Under the common fund doctrine, a litigant who confers a common monetary benefit upon an ascertainable class is entitled to an allowance for fees and expenses to be paid from the fund or property which his efforts have created.").

by the corporate enterprise or the stockholders as a group."[16] To obtain an award under either doctrine outside of a negotiated settlement, "an applicant must show, as a preliminary matter, that: (1) the suit was meritorious when filed; (2) the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and (3) the resulting corporate benefit was causally related to the lawsuit."[17]

With respect to the element of causation, Delaware law presumes that a plaintiff's action caused the benefit when a corporate defendant "takes action that renders the claims asserted in the complaint moot" and imposes on the corporation "the burden of persuasion to show that no causal connection existed between the initiation of the suit and any later benefit to the shareholders."[18] As our Supreme Court has explained, "[t]his rebuttable presumption exists because it is the 'defendant and not the plaintiff, who is in a position to know the reasons, events and decisions leading up to the defendant's action.'"[19]

---

[16] *In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 357 (Del. Ch. 1999), *aff'd sub nom. First Interstate Bancorp v. Williamson*, 755 A.2d 388 (Del. 2000) (citing *Dunkin' Donuts*, 1990 WL 189120, at *7).

[17] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997); *see also Cal-Maine Foods, Inc. v. Pyles*, 858 A.2d 927, 929 (Del. 2004).

[18] *United Vanguard*, 693 A.2d at 1080.

[19] *Id.* (citing *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 880 (Del. 1980)).

9

Defendants argue that the burden to disprove causation should not be placed on them because "the Price Reduction did not moot any of Plaintiff's claims or requested relief."[20] According to defendants, plaintiff's original complaint only "sought injunctive relief to fix purported process and disclosure concerns" and had nothing to do with the Price Reduction.[21] Defendants also vigorously dispute plaintiff's contentions that this action was meritorious when filed or that plaintiff played any role in causing the Price Reduction as a factual matter.

With respect to the latter point, defendants submitted an affidavit from Michael Roemer, a C&J Inc. director. He categorically denies that plaintiff's lawsuit caused the Price Reduction "in any way" and attributes the cause of the Price Reduction solely to industry conditions:

> Plaintiff's lawsuit did not cause the Price Reduction in any way. At no time during the C&J Board's evaluation, negotiation, or approval of the Price Reduction was it connected or attributed to Plaintiff's lawsuit. For instance, the C&J Board did not believe that Plaintiff's lawsuit had reduced the chances of C&J's stockholders approving the Transaction, and the Price Reduction was not an attempt to counteract any alleged negative publicity arising from Plaintiff's lawsuit. When the C&J Board was evaluating, negotiating, and approving the Price Reduction, Plaintiff's lawsuit was not a concern to the C&J Board, particularly in light of the Delaware Supreme Court's December 2014 decision.

> Industry conditions, and not Plaintiff's lawsuit, caused the Price Reduction. More specifically, the C&J Board determined that it was appropriate to ask Nabors for the Price Reduction in light of declining

---

[20] Defs.' Opp'n Br. 19-20.

[21] Defs.' Opp'n Br. 20.

oil and natural gas prices, which contributed to a significant industry downturn and lower equity values. The C&J Board discussed the potential impact of deteriorating industry conditions on stockholder approval of the Transaction. At no time was Plaintiff's lawsuit considered during these discussions.[22]

Plaintiff questions Roemer's assertion that the decline in the energy markets was the cause of the Price Reduction. According to plaintiff, the energy markets had declined significantly in the September to November 2014 timeframe, before the court ordered the solicitation process, yet the C&J Inc. board made no effort to renegotiate with Nabors during that period. Relying on the minutes from C&J Inc.'s December 18, 2014 board meeting, referenced above, plaintiff further argues that the timing of the commencement of negotiations with Nabors shows that its efforts contributed to the Price Reduction. More specifically, according to plaintiff, the minutes reflect that Comstock started negotiations for the Price Reduction between the time when Cerberus made a "potentially superior proposal" on December 11, 2014, and when the Delaware Supreme Court reversed the injunction on December 19, 2014.[23]

---

[22] Defs.' Opp'n Br. Ex. N ¶¶ 4-5.

[23] Pl.'s Reply Br. 3-4. The December 18 board minutes reflect that Comstock "had initiated such negotiations" by that date, but the record is unclear as to whether those negotiations began before or after Cerberus made its proposal on December 11. Defs.' Opp'n Br. Ex. D at 2. The December 18 board minutes also reflect that the special committee's financial advisor, Morgan Stanley & Co. LLC, "explained that the materials presented to the Special Committee reflected that the transaction between the Company [C&J Inc.] and Nabors

11

Although it can be difficult to draw firm conclusions about causation on a paper record,[24] I am satisfied from the record before me that defendants have rebutted the presumption of causation and demonstrated that no causal connection existed between the initiation of this action and the Price Reduction.[25] In particular, I find Roemer's affidavit to be persuasive.[26] It provides a logical and compelling explanation that C&J Inc. sought the Price Reduction to assuage its stockholders' concerns about the economic merits of the proposed transaction as originally negotiated in view of subsequent deteriorating conditions in the oil and gas industry in order to secure stockholder approval of the transaction. In that regard, it makes sense to me that the Price Reduction negotiations began in the late December

---

creates more potential value to the Company's stockholders from a financial point of view than would the Cerberus proposal." *Id.* at 1.

[24] *United Vanguard*, 693 A.2d at 1080 (noting that "a defendant's burden is particularly heavy" on a motion for summary judgment "because it must show on undisputed facts that the assertions of the lawsuit had no causative effect on the subsequent benefit").

[25] Because defendants have rebutted the presumption of causation, I do not address their other arguments, namely, whether the rebuttable presumption should apply here in the first place or whether plaintiff's claims were meritorious when filed.

[26] Plaintiff did not seek to depose Roemer or to take any discovery to respond directly to his affidavit. When asked why not, plaintiff pointed to an earlier ruling of the court. *See* Tr. (Oct. 13, 2017) 150-154 (Dkt. 341). On July 14, 2015, the court denied plaintiff's request to take discovery into the Price Reduction for the purpose of trying to establish an "offset" for any damages defendants might be awarded against the injunction bond. *See* Tr. (July 14, 2015) 78-81 (Dkt 180). The court denied that request as irrelevant to the bond issue. The court made clear, however, that whether plaintiff had conferred a benefit in connection with the Price Reduction was an issue for another day, thus leaving open the opportunity for plaintiff to seek discovery in aid of a fee application if and when that issue became ripe. *Id.* 92. Plaintiff elected not to do so and decided instead to press its fee application based on the present record.

timeframe even if the decline in the energy markets had begun earlier, not because of the existence of the litigation, but because that was when the stockholder vote was approaching and the need to ensure sufficient stockholder support became imminent. The fact that the negotiations continued into February 2015, well after the Supreme Court lifted the preliminary injunction, further supports Roemer's sworn assertion that the negotiations were motivated by a desire to obtain stockholder approval of the transaction and were not undertaken in response to plaintiff's litigation efforts.

Apart from my conclusion that defendants successfully rebutted the presumption of causation, there is another issue implicated by plaintiff's fee application that provides an independent ground for its denial, which is: even if some fee award were appropriate in this case, would it be appropriate to require Comstock's estate to pay it?

The direct beneficiary of the Price Reduction was C&J Inc., which saved itself from paying $250 million of the approximately $938 million in cash consideration it initially agreed to pay Nabors when they entered into the merger agreement in June 2014. The Price Reduction thus can be conceived of as a benefit that accrued to all of C&J Inc.'s stockholders collectively as of the closing of the merger.

The payment of a fee award from a common fund ordinarily should be taken out of the fund itself before it is disbursed. Here, there was no actual "fund" to be disbursed, but there was a cost savings for C&J Inc. In such a scenario, it would be

logical that payment of a mootness fee be taken from the corporate treasury of C&J Inc. for reasons discussed below. In this case, however, the corporate treasury of C&J Inc. and its post-merger parent (C&J Ltd.) are not available as a source of payment. As discussed above, plaintiff never filed a proof of claim against either entity, and any liability either of them could have had for a fee application in this case was discharged as a result of the bankruptcy court's approval of their reorganization plan.

Confronted with the reality that C&J Inc. and C&J Ltd. are not available to pay a fee award, plaintiff's application takes a novel approach. Plaintiff asks the court to require that Comstock's estate pay a fee award on the theory that Comstock was one of the company's "top shareholders" who owned approximately 11% of C&J Inc.'s outstanding shares as of the date of the merger and who "benefited the most from this litigation."[27] In support of this request, plaintiff relies on this court's decision in *In re First Interstate Bancorp Consol. S'holder Litig.*[28]

---

[27] Pl.'s Opening Br. 25-27. In its reply brief, plaintiff sought to broaden the target for its fee request to include the other "non-debtor defendants." Pl.'s Reply Br. 26. In addition to being without merit for the reasons discussed above, this argument was waived because plaintiff failed to fairly raise it in its opening brief. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (holding that plaintiff waived arguments by failing to raise them in its opening brief).

[28] 756 A.2d 353 (Del. Ch. 1999).

In *First Interstate*, stockholders of First Interstate Bancorp filed suit against its directors for taking actions to ward off the efforts of Wells Fargo & Co. to acquire First Interstate. The directors of First Interstate eventually dropped their opposition to Wells Fargo's overtures, and the two companies entered into a merger agreement. The closing of the merger rendered major aspects of plaintiffs' case moot, prompting plaintiffs to seek an award of attorneys' fees for having provided First Interstate's stockholders "greater value in the acquisition of their shares than would otherwise have been the case."[29]

Before reaching the merits of the fee claim, the court noted that "it [was] necessary to resolve a more basic dispute. If a fee is to be paid, where will the money come from to pay it?"[30] Plaintiffs could not recover fees from the stockholders of First Interstate because "the 'common fund' represented by the increased consideration paid to the First Interstate stockholders . . . was disbursed to them several years ago."[31] The court held, however, that "First Interstate, or its successor by merger [Wells Fargo], should be held responsible for the payment of fees to plaintiffs' counsel."[32]

---

[29] *Id.* at 359 n.3.

[30] *Id.* at 356-57.

[31] *Id.* at 357.

[32] *Id.* at 362.

15

In reaching this conclusion, the court explained that "where individual or class litigation results in the conferral of an unquantified benefit on the stockholders as a whole, the corporation may be liable to pay fees . . . 'the assets of the corporation being a fund belonging to the stockholders in common.'"[33] The court further reasoned that, because the merger was stock-for-stock, the stockholders of the post-merger entity (Wells Fargo) were, "in some substantial degree," former stockholders of First Interstate who received the litigation benefit.[34] The court's ultimate conclusion also was influenced by the equitable consideration that the record reflected "that plaintiffs' counsel had some understanding, engendered by their communications with counsel for Wells Fargo, that the corporate entities would pay whatever fee was awarded."[35]

Applied to this case, the holding of *First Interstate* supports looking to the corporate treasury of C&J Inc. and potentially of C&J Ltd. as a source of payment if plaintiff was entitled to a fee award. Permitting recovery from C&J Ltd., the post-merger parent of C&J Inc., would be analogous to the court's decision in *First Interstate* to permit recovery from Wells Fargo. The case provides no support, however, for singling out Comstock or a subset of former director-stockholders of

---

[33] *Id.* at 358 (quoting *Richman v. DeVal Aerodynamics, Inc.*, 185 A.2d 884, 885 (Del. Ch. 1962) (Seitz, C.)).

[34] *Id.* at 360.

[35] *Id.*

C&J Inc. as the source of payment when the alleged benefit warranting a fee award redounded to the benefit of all stockholders. Plaintiff has identified no authority in which the Court of Chancery (or any other court) has approved such an application, and it would be inequitable to do so in my view.

"The common benefit doctrine is 'founded on the equitable principle that those who have profited from litigation should share its costs.'"[36] As former Chancellor Chandler explained, the doctrine "provides that where a common benefit has been conferred upon stockholders, all stockholders should contribute to the costs incurred to confer the benefit."[37] The "doctrine's underlying rationale is that all of the stockholders benefited from plaintiffs' action and should have to share in the costs of achieving that benefit."[38] Stated another way, "the benefited class," *i.e.* the corporate enterprise or the stockholders as a group, "should foot the bill of whoever cause[d] the benefit to be conferred"[39] so that the costs are shared *pro rata*. Thus, permitting plaintiff to cherry-pick which of C&J Inc.'s stockholders should foot the bill for a potential fee award cannot be squared with the equitable rationale of the

---

[36] *Chen v. Howard-Anderson*, 2017 WL 2842185, at *1 (Del. Ch. June 30, 2017) (quoting *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1044 (Del. 1996)).

[37] *Berger v. Pubco Corp.*, 2008 WL 4173860, at *1 (Del. Ch. Sept. 8, 2008) (citing *Weinberger v. UOP, Inc.*, 517 A.2d 653, 656 (Del. Ch. 1986)); *see also United Vanguard*, 693 A.2d at 1079 (same).

[38] *Robert M. Bass Grp., Inc. v. Evans*, 1989 WL 137936, at *2 (Del. Ch. Nov. 16, 1989) (internal quotations and citation omitted).

[39] *Dunkin' Donuts*, 1990 WL 189120, at *10.

17

doctrine. Indeed, permitting such a result would sanction the invidious treatment of stockholders, which would be *inequitable* and could lead to the absurd result of exposing stockholders to non-*pro rata* liability.

I also am unpersuaded by plaintiff's invocation of the principle of unjust enrichment to justify isolating Comstock or any of the other C&J Inc. directors as a source of payment. All of the claims asserted against the directors in this action were dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. Thus, there is nothing "unjust" in allowing these individuals to retain whatever benefit this litigation theoretically may have conferred on them as stockholders to the same extent as the company's other stockholders are permitted to retain such a benefit.

Finally, I reject plaintiff's suggestion that Comstock's estate "should be jointly and severally liable" with the company for a fee award.[40] Putting aside that it would be inequitable to assess a fee award against Comstock's estate or a small subset of director-stockholders on a non-*pro rata* basis, as discussed above, plaintiff appears to be statutorily barred from seeking payment from any C&J Inc.

---

[40] Pl.'s Reply Br. 28; *see also* Pl.'s Opening Br. 25 ("Comstock's estate should be jointly liable for fees.").

18

stockholder for a debt of the corporation because plaintiff failed to secure a judgment from the corporation in the first place.[41]

In sum, plaintiff's assertion that Comstock's estate or any of the C&J Inc. director defendants should be held liable for the entirety of a fee award based on a benefit all stockholders allegedly received would be unprecedented, inconsistent with the rationale of the corporate benefit doctrine, and inequitable.[42] Thus, I deny plaintiff's fee application for this additional reason.

## IV. CONCLUSION

For the reasons explained above, plaintiff's application for an award of attorneys' fees is denied.

**IT IS SO ORDERED.**

---

[41] *See* 8 *Del. C.* § 325(b) ("No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which such person is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon return unsatisfied."); *see also Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 764 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) (holding that "325(b) of the Delaware General Corporation Law bar[red] [plaintiff] from seeking to hold Goldman Sachs [a single stockholder] responsible for" a company's liability because plaintiff could not secure a judgment against the company) (Strine, V.C.).

[42] At oral argument, plaintiff raised for the first time the possibility of seeking fees from Nabors. Tr. 109 (Oct. 13, 2017) (Dkt. 341). Apart from the fact that plaintiff waived the argument by never raising it in its briefs, it would be totally illogical to permit such a result. The Price Reduction redounded to Nabors' *detriment* by decreasing the compensation it received in connection with its transaction with C&J Inc.

19