# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE RIVERBED TECHNOLOGY, | ) | CONSOLIDATED |
| INC. STOCKHOLDERS LITIGATION | ) | C.A. No. 10484-VCG |

## MEMORANDUM OPINION

Date Submitted:  August 7, 2015
Date Decided:  September 17, 2015

Peter B. Andrews and Craig J. Springer, of ANDREWS & SPRINGER, LLC, Wilmington, Delaware; Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, and Jeremy J. Riley, of RIGRODSKY & LONG, P.A., Wilmington, Delaware; OF COUNSEL:  Jason M. Leviton, Stephen P. Harte, and Joel A. Fleming, of BLOCK & LEVITON LLP, Boston, Massachusetts; Kent A. Bronson, Arvind Khurana, and Roy Shimon, of MILBERG LLP, New York, New York, *Attorneys for Plaintiffs.*

Tamika Montgomery-Reeves and Bradley D. Sorrels, of WILSON SONSINI GOODRICH & ROSATI, PC, Wilmington, Delaware; OF COUNSEL:  David J. Berger, Katherine L. Henderson, and David A. Brown, of WILSON SONSINI GOODRICH & ROSATI, PC, Palo Alto, California, *Attorneys for the Riverbed Defendants.*

William M. Lafferty and Ryan D. Stottmann, of MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Mark E. McKane, PC and Ashley Littlefield, of KIRKLAND ELLIS LLP, San Francisco, California, *Attorneys for the Project Homestake Holdings, LLC, Project Homestake Merger Corp., and Thoma Bravo, LLC.*

Joseph L. Christensen, of JOSEPH CHRISTENSEN P.A., Wilmington, Delaware, *Attorney for Objector Sean J. Griffith.*

GLASSCOCK, Vice Chancellor

As a bench judge in a court of equity, much of what I do involves problems of, in a general sense, agency: insuring that those acting for the benefit of others perform with fidelity, rather than doing what comes naturally to men and women—pursuing their own interests, sometimes in ways that conflict with the interests of their principals. In this task, I am generally aided by advocates in an adversarial system, each representing the interest of his client. Of course, these counsel are themselves agents, but their actions are generally aligned with that of their principals in a way that does not require Court involvement. The area of class litigation involving the actions of fiduciaries stands apart from this general rule, however, especially in litigation like the instant case, involving the termination of ownership rights of corporate stockholders via merger. Such cases are particularly fraught with questions of agency: among others, the basic questions regarding the behavior of the fiduciaries that are the subject of the litigation; questions of meta-agency involving the adequacy of the actions of the class representative—the plaintiff—on behalf of the class; and what might be termed meta-meta-agency questions involving the motivations of counsel for the class representative in prosecuting the litigation. At each remove, there may be interests of the agent that diverge from that of the principals. This matter, involving the deceptively straightforward review of a proposed settlement, bears a full load of such freight.

This matter is before me to approve a settlement on behalf of a class consisting of the common stockholders (the "Class")[1] of Riverbed Technology, Inc. ("Riverbed" or the "Company"). The litigation arises from a transaction in which Thoma Bravo, LLC ("Thoma Bravo") and Teachers' Private Capital, an affiliate of Ontario Teachers' Pension Plan, acquired all outstanding shares of Riverbed at a price of $21 per share, cash, valuing the Company at approximately $3.6 billion (the "Merger"). The Plaintiffs initially sought to enjoin the Merger, alleging that the sales process undervalued the Company and was tainted by conflicts of interest.[2] The Plaintiffs also raised a number of disclosure claims, some of which were mooted by the definitive proxy (the "Mooted Disclosures"). Shortly after the filing of the definitive proxy, I granted expedition on the claims regarding disclosure of potential conflicts of interest held by Goldman Sachs, one of the financial advisors. Approximately ten days later, the parties executed a Memorandum of Understanding, and ultimately entered into the Stipulation and Agreement of Compromise, Settlement and Release (the "Settlement") pursuant to

---

[1] The Class is defined to include "any and all record and beneficial owners of Riverbed common stock during the period beginning on December 14, 2014, and ending with the consummation of the Merger." *See* Stipulation and Agreement of Compromise, Settlement and Release § 1(a).

[2] For example, in the Amended Complaint, the Plaintiffs noted prominently that approximately a year earlier, Riverbed's board of directors rejected an offer from hedge fund Elliot Management Corporation (together with its affiliates, "Elliot") for $21 per share as inadequate. Am. Complaint ¶¶ 4–5. Around the time of Elliot's offer, the Company had been valued by analysts at $25 per share, and in the year preceding the transaction, the Company's stock price was as high as $20.87 per share. Ultimately, however, the Company had negative results in more recent quarters and received the $21 price from Thoma Bravo following an auction process wherein no topping bidders emerged.

3

which the Company made supplemental disclosures in an SEC filing prior to the stockholder vote (the "Supplemental Disclosures").

## A. Class Certification

I first address the certification of the Class. This is a stockholder action that alleges breaches of fiduciary duties, raising identical issues with respect to each member of the very numerous Class. For the reasons set out in multiple decisions of this Court, this Class and its representation by experienced Plaintiffs' counsel meets the requirements of Rule 23(a).[3] This action also satisfies Rule 23(b)(1)–(2); this Court has recognized that actions challenging the exercise of fiduciary duties in corporate transactions are properly certifiable under Rule 23(b)(1), and Rule 23(b)(2) is satisfied because the Plaintiffs seek final relief with respect to the Class as a whole.[4] The only remaining question regarding certification of the Class representatives involves whether the representatives and their counsel had adequate incentives to pursue faithfully the interests of the Class, which is subsumed in the analysis of the Settlement, discussed below.

## B. Objectors' Standing

Before turning to the substantive analysis of the agency considerations at issue, both in the class action context generally and in the specific Settlement here,

---

[3] Rule 23 requires a showing of numerosity, commonality, typicality, and adequacy of representation. Ct. Ch. R. 23(a).

[4] *See, e.g.*, *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2086371, at \*2 (Del. Ch. May 19, 2014).

4

I note that no stockholder owning stock on or before the date the Merger was announced made a timely objection.[5] However, one objector, Sean J. Griffith (the "Objector"), a law school professor who has written academically on the agency problem addressed here,[6] bought stock in the Company for the specific purpose of making an objection. He filed a brief opposing the Settlement and was represented by counsel at the settlement hearing.

The Plaintiffs urge me to find that a party taking exception to a potential settlement must be a stockholder *before the underlying transaction is announced*. This argument is made despite the fact that Mr. Griffith is clearly a member of the Class who will be affected by the Settlement, and that it is the Settlement itself that

---

[5] Sam Kazman, who held his Riverbed stock through an account with Fidelity, filed an untimely objection, arguing that the settlement should not be approved because he only received notice on the final day for filing objections. The Defendants have provided information showing that the notice process complied with my Order. As Vice Chancellor Laster recently noted in *Activision*, those who hold stock through nominees do so at the risk of missing notice of corporate actions. *In re Activision Blizzard, Inc. S'holder Litig.*, 2015 WL 2438067, at \*29 (Del. Ch. May 21, 2015). In the absence of a deviation from the Court-ordered notice, which was reasonably calculated to inform stockholders of this action, and in light of the difficulties inherent in holding stock through a nominee, Mr. Kazman's objection to the process by which he was given notice is unpersuasive.

A second former stockholder, Dr. Mark Stuart Day, sent a letter of objection on July 30, 2015, ostensibly motivated by reading a Wall Street Journal article about this settlement. That letter indicates that Day lacked a sufficient incentive to make a timely and substantive objection and conveyed Day's position that the "settlement is of no benefit to an ordinary shareholder like [him], and serves only to enrich the people filing the original suit(s)." While that letter raises an interesting question of the adequacy of an incentive for individual stockholders to object to settlements with which they disagree, it does not affect my analysis of the consideration given and received in this settlement under Delaware law. Plaintiffs, however, responded to Dr. Day's letter; Day's reply was submitted on August 7, 2015, and I consider the matter submitted for decision as of that date.

[6] Jill E. Fisch et al., *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 Tex. L. Rev. 557 (2015).

is the "transaction" he seeks to challenge. The Plaintiffs opine that if objectors in Mr. Griffith's position are permitted to be heard, "professional" objectors with nefarious strike-suit motives will pop up like mushrooms after a two-day rain. This Court has tools, however, including application of the doctrine of unclean hands, to deal with that problem, should it occur. At any rate, given that Mr. Griffith is a member of the Class and thus interested in the Settlement, I find that he is entitled to oppose the Settlement.

*B. Consideration of the Proposed Settlement*

In light of the agency problems inherent in representative litigation, mentioned above and discussed in more detail below, it falls to this Court to determine whether a proposed class action settlement is fair to the Class. This Court and our Supreme Court have recognized that the evaluation of fairness involves consideration of the "balance [of] the value of all the claims being compromised against the value of the benefit to be conferred on the Class by the settlement."[7] But, more broadly, "[t]he Court of Chancery plays a special role when asked to approve the settlement of a class or derivative action. It must balance the policy preference for settlement against the need to insure that the *interests of the class have been fairly represented*."[8] This does not require the

---

[7] *In re MCA, Inc. S'holders Litig.*, 598 A.2d 687, 691 (Del. Ch. 1991); *see also Brinckerhoff v. Texas E. Prod. Pipeline Co.*, 986 A.2d 370, 384 (Del. Ch. 2010).
[8] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del. 1989) (emphasis added).

6

settlement to be the best possible outcome for the Class conceivable by the Court. It does require the Court to ensure that divided loyalties have not influenced the actions of the Class representative and counsel, and that the settlement reached is reasonable in light of the facts alleged and the record developed, and in light of the proposed release of claims.

### 1. The Agency Problems

#### a. The Interests of the Class Representative and Counsel

Settlements in class actions present a well-known agency problem: A plaintiff's attorney may favor a quick settlement where the additional effort required to fully develop valuable claims on behalf of the class may not generate an additional fee as lucrative to the plaintiff's attorney as accepting a quick and moderate fee, then pursuing other interests. The interest of the principal—the individual plaintiff/stockholder—is often so small that it serves as scant check on the perverse incentive described above, notwithstanding that the aggregate interest of the class in pursuing litigation may be great—the very problem that makes class litigation appropriate in the first instance.

This agency problem is, in part, ameliorated—but not entirely eliminated—by requiring counsel for both sides to refrain from negotiating fees until a settlement of the underlying matter is reached. I am assured that this hygienic procedure was followed scrupulously here. Nonetheless, the agency problem

7

remains, as both sides are necessarily aware that the common benefit doctrine will permit the plaintiffs to seek an award of fees.

Nothing in this discussion should be read as a criticism of plaintiffs' counsel in class actions, either collectively or with reference to the individuals here. In fact, the proper functioning of our system of common-law review of corporate actions could not occur absent an active plaintiffs' bar, and much conduct by corporate fiduciaries inimical to the interests of the stockholders—the core agency problem—would never see the light of day if not for the efforts of counsel and the risks they take in the prosecution of cases for a contingency fee, on behalf of the stockholders.[9] It has also been my experience that counsel appearing on behalf of a class take their professional responsibilities to that class seriously. Nonetheless, in reviewing settlements, the incentives that operate on the representatives and their counsel bear examination.

### b. The Incentives of the Defendants

The adversarial system provides little comfort that mal-alignments between the interests of the class and its counsel resulting from perverse incentives will be revealed and addressed, because the defendants' interest is largely subsumed within that of the successor entities' interest, which is commonly in the consummation of the deal and the termination of any further litigation threat.

---

[9] The role of the Court in assigning a proper incentive for such litigation is discussed in the context of the fee award request, below.

8

Where the defendants' interest may be captured via a broad release, inexpensive disclosures and a modest—in light of the value of the merger—fee award, there is little incentive for the defendants to engage in further litigation even if the claims are weak; and every reason to go forward to obtain via settlement what one member of this Court has termed "deal insurance," the broadest release possible.[10]

In combination, the incentives of the litigants may be inimical to the class: the individual plaintiff may have little actual stake in the outcome, her counsel may rationally believe a quick settlement and modest fee is in his best financial interest, and the defendants may be happy to "purchase," at the bargain price of disclosures of marginal benefit to the class and payment of the plaintiffs' attorney fees, a broad release from liability.

### c. The Lack of an Adversary

It is the agency problem just described (among other factors) that, despite this Court's general encouragement of settlement rather than litigation, mandates scrutiny of settlements by this Court in class actions.[11] In a case involving individual litigants as opposed to a class action, of course, it is the plaintiffs who

---

[10] *In re Intermune, Inc., S'holder Litig.*, C.A. No. 10086-VCN (Del. Ch. Jul. 8, 2015) (TRANSCRIPT).

[11] *See, e.g., Mannix v. PlasmaNet, Inc.*, 2015 WL 4455032, at *4 (Del. Ch. July 21, 2015); *In re Activision Blizzard, Inc. S'holder Litig.*, WL 2438067, at *12 (Del. Ch. May 21, 2015) (The potential divergence between the personal interests of the attorneys conducting the litigation and the interests of the class or corporation they represent means that "the Court of Chancery must . . . play the role of fiduciary in its review of these settlements . . . ." (quoting *In re Resorts Int'l S'holders Litig. Appeals*, 570 A.2d 259, 266 (Del.1990)).

must scrutinize the claims being given up, the value of the settlement, and, in the case of a broad release, the potential value of unknown claims being surrendered in connection with the settlement. In the class action arena, it falls to the Court to consider the fairness of that exchange.[12]

The interests of the individual litigants and their counsel may not be fully aligned with the class, as I have described. Moreover, members of the class, who are the potential losers if the settlement is improvidently approved, may, like the class representative, have but a small stake in the outcome; they may not have sufficient incentive to make appearance and objection worthwhile.[13] This typically leaves the judge to attempt to address the practical equitable factors involved, without the valuable assistance of true adversarial presentations. In this particular case, however, I had the benefit of such a presentation. I now turn to the equities of the settlement proposed.

### d. Considerations in this Matter

---

[12] *In re Philadelphia Stock Exch., Inc.,* 945 A.2d 1123, 1137 (Del. 2008) ("On a motion to approve a settlement, the trial court is not required to try the case or decide the issues on the merits. Rather, 'the court's function is to consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors.'" (quoting *Polk v. Good,* 507 A.2d 531, 535 (Del. 1986))); *In re Countrywide Corp. Shareholders Litig.,* 2009 WL 2595739, at *3 (Del. Ch. Aug. 24, 2009) ("In assessing the fairness of the Proposed Settlement in relation to the release of such claims the Court focuses its evaluation primarily on the probable validity of the claims, and the apparent difficulty of enforcing them."), *aff'd sub nom. Arkansas Teacher Ret. Sys. v. Caiafa,* 996 A.2d 321 (Del. 2010).
[13] *See infra* note 5.

This case, like many stockholder actions settled in this Court, was resolved by the Defendants agreeing to make additional disclosures to the stockholders, which in theory enable the plaintiff Class to exercise its franchise in a better-informed manner. While such disclosures are in some instances material to the class members in exercising their voting franchise, and are thus valuable,[14] in other cases their value is dubious. In return, the Plaintiffs agreed to forgo the substantive process claims alleged in the complaint and to release all claims arising from the merger. The concern of this Court must be the agency problem described above, in light of the Defendants' interest in making a few low-cost disclosures and consenting to a modest fee request in return for release of what might be valuable claims both under fiduciary common law and Federal statutory law. That is the setting under which my analysis must occur.

### 3. Fairness of this Settlement

The Plaintiffs and the Defendants agree that settlement is appropriate here. The Plaintiffs first point to the Supplemental Disclosures it obtained for the Class.[15] The definitive proxy disclosed only that one of the financial advisors,

---

[14] *But see* Jill E. Fisch et al., *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 Tex. L. Rev. 557 (2015).

[15] For purposes of determining the fairness to the Class of the settlement, I consider only the Supplemental Disclosures, which were the consideration flowing to the Class in exchange for the Defendants' release. The Plaintiffs also seek credit for a handful of Mooted Disclosures, that is, the deficient disclosure claims raised in the complaints that were mooted by filing of the definitive proxy. I consider those in connection with the Plaintiffs' request for attorney's fees, discussed below.

Goldman Sachs, had at least a prior business relationship with the purchasers; the Supplemental Disclosures explicitly showed that Goldman had present engagements with the purchasers and their affiliates. Moreover, the Supplemental Disclosures informed the stockholders, for the first time, of the substantial nature of Goldman's relationship with these entities. Specifically, Goldman had received approximately $25 million in fees from one of the purchasers (or its affiliates)[16] within the two years leading up to the Merger here; by contrast, Goldman received approximately $30 million for its services in the Merger.[17] The Supplemental Disclosures also included several less substantive disclosures, such as the (conservative) tax rates used by the financial advisors in their fairness opinions. Those are less substantial, in my view, as they merely disclose facts making the transaction *more* attractive to the Class.[18]

While the disclosures involving Goldman are negative disclosures of the type this Court has in the past found of value to the Class, I note that, of the shares

---

[16] Griffith argued that I should discount the force of this disclosure since it conflated the purchasers, their affiliates, and their portfolio companies.

[17] Griffith argued that these conferred no benefit to the Class, as the previous disclosures already made clear that Goldman "has provided certain . . . services to [the Company, as well as the purchasers, and their affiliates] from time to time for which [it] has received, *and may receive*, compensation." Griffith contends that "may receive" suggests continuing engagement, and that the disclosure that Goldman was providing services as of December 14, and the amount of fees received in the previous two years for those services, did not alter the total mix of information available to stockholders.

[18] While it is possible that "positive" disclosures may add materially to the total mix of information considered by a stockholder, a board of directors has every reason to make such positive disclosures in support of an action it has recommended; little judicial oversight is needed with respect to such disclosures.

voting, 99.48% voted in favor of the Merger *despite* the disclosures. This demonstrates to me, even without resort to the academic literature that questions the value of disclosures to the Class, that the disclosure here was not of great importance. To use the expression first made in this context by Chancellor Allen, the Plaintiffs have achieved for the Class a peppercorn,[19] a positive result of small therapeutic value to the Class which can support, in my view, a settlement, but only where what is given up is of minimal value.

The Plaintiffs, through counsel at oral argument and in the briefing, argue strenuously that although the fiduciary duty claims in the complaint were robust, their expert informed the Plaintiffs that he could not opine that the Merger price was unfair to the Class. In light of that representation, therefore, while viable (according to the Plaintiffs) fiduciary duty claims are being released, they are not claims that could have resulted, if pursued, in a benefit to the Class. Further, Plaintiffs' counsel testified that he is expert in the area of Federal securities litigation, that he examined the record with an eye toward potential Federal claims, and that none appeared viable. In light of that, according to the Plaintiffs, the "give" from the Class in connection with the Settlement is basically nil.

The Objector made two arguments against acceptance of the Settlement. First, he argued that the Supplemental Disclosures are essentially valueless. I have

---

[19] *See Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *4 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996).

already found, however, that the Supplemental Disclosures had tangible, although minor, value to the Class. At oral argument, the Objector pursued a second course: arguing that there may be valuable unknown claims extinguished by the release and that the lack of a full record should cause me to reject the Settlement, leaving the parties to pursue further litigation or attempt to reach a settlement with a much narrower release. This, in light of the rather meager benefit achieved by the Settlement for the Class, as well as the broad release bargained for, is a serious objection. In another factual scenario it might well carry the day. However, under the specific facts here, I find the Settlement appropriate, in light of the following.

I note first that, given the past practice of this Court in examining settlements of this type, the parties in good faith negotiated a remedy—additional disclosures—that has been consummated, with the reasonable expectation that the very broad, but hardly unprecedented, release[20] negotiated in return would be approved by this Court. I note that this factor, while it bears some equitable weight here, will be diminished or eliminated going forward in light of this Memorandum Opinion and other decisions of this Court.[21] I also note that this is a case in which

---

[20] The breadth of the release here is a matter of dispute between the parties and the Objector; they debate whether it is so broad as that described by judges in this jurisdiction as "inter-galactic." Whether this particular release is indeed inter-galactic, or only, say, solar-systemic, Jovian or just global, it is a broad release of existing claims arising from the merger, known and unknown.

[21] *See generally In re Susser Holdings Corp. S'holder Litig.*, C.A. No. 9613-VCG (Del. Ch. Sept. 15, 2015) (TRANSCRIPT); *Acevedo v. Aeroflex Holding Corp.*, C.A. No. 9730-VCL (Del. Ch.

Plaintiffs' counsel carefully considered Federal claims and found them not viable. Importantly, any potential fiduciary duty damages claims—the claims that the Objector strongly urges should be investigated before a general release is entered—would face the same shortcoming which dooms the claims specifically raised in the Amended Complaint: the lack of an expert opinion that the Merger was at an unfair price.[22] Finally, I note that the Objector has no interest in taking over the litigation, and that no other member of the Class has filed a timely objection, let alone sought to pursue further fiduciary claims.

In light of the unique circumstances described above, if I may describe what has been achieved for the Class as a peppercorn, what has been released looks more like a mustard seed. That fact notwithstanding, the breadth of the release is troubling. It is hubristic to believe that upon this record I can properly evaluate, and dismiss as insubstantial, all potential Federal and State claims. If it were not for the reasonable reliance of the parties on formerly settled practice in this Court, which I have found above, the interests of the Class might merit rejection of a settlement encompassing a release that goes far beyond the claims asserted and the results achieved. However, in the specific circumstances presented, I find the Settlement fair to the Class, and approve it.

---

Jul. 8, 2015) (TRANSCRIPT); *In re Intermune, Inc., S'holder Litig*., C.A. No. 10086-VCN (Del. Ch. Jul. 8, 2015) (TRANSCRIPT).

[22] Damages is not an element of a breach of fiduciary duty claim; nonetheless, as a practical matter, such a claim is of little value where damages are not provable.

*D. Attorney's Fees*

Finally I turn to attorney's fees. This Court follows the American Rule on fees, under which each party bears its own. Exceptions exist, however, and to the extent that the Plaintiffs have achieved a benefit, via prosecution of litigation meritorious when filed, shared by the owners of the company—the class of common stockholders[23]—the Plaintiffs are entitled to share the reasonable costs of the litigation with the Class.[24] Here, the Plaintiffs seek, and Defendants do not oppose, a fee of $500,000. I have already found that a tangible, if minor, Class benefit was achieved by way of one of the Supplemental Disclosures. It is clear that this result was entirely caused by this litigation, as recited in the Stipulation and Agreement of Compromise, Settlement and Release. However, that result is too modest a benefit to justify the fee sought here.

The Plaintiffs also contend that the Mooted Disclosures, that is, those disclosures in the definitive proxy that were made after the seven individual complaints alleged deficiencies in the preliminary proxy, should be considered in my award of attorney's fees. The most significant of the Mooted Disclosures

---

[23] *See In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 357–60 (Del. Ch. 1999) (discussing the appropriate source of fees for benefit to a stockholder class under the "common fund" and "corporate benefits" doctrines).

[24] *See, e.g.*, *id.* at 362 (stating that "it is more fair to require [the successor entity] to pay a fee to plaintiffs' counsel than to deny them any fee at all. Because no other source of payment is available, this court will regard the assets of [the successor entity] as 'being a fund belonging to the stockholders in common.'" (quoting *Richman v. DeVal Aerodynamics, Inc.*, 185 A.2d 884, 885 (Del. Ch. 1962))).

included inputs to the free cash flow projections for 2014–2019 derived by management and relied upon by the financial advisors; management's capital expenditure projections for 2014–2019; and the financial advisors' treatment of stock-based compensation in their fairness opinions. To the extent those disclosures were of value to the Class, they can support a fee award, but only if the litigation itself was both meritorious when filed[25] and the cause of the disclosures.

Under Delaware law, a presumption of causation arises by chronology; that is, where claims against a defendant are mooted while litigation is pending, the actions mooting the claims are presumed to have resulted from the litigation.[26] This presumption makes good sense, since the defendant taking the action is in the best position to know—and thus demonstrate—its own motivation for acting as it did. I question whether such a presumption should obtain in the situation presented here, however. Here, the disclosures were made in the definitive proxy. It is true that the initial complaints in this case were commenced before the definitive proxy was filed, mooting some claims. It is also true that these cases were pending even before the *preliminary* proxy was filed, and necessarily contained much in the way of boilerplate of the type ubiquitously pled in connection with public-company mergers; and that the information disclosed in the definitive (but not the preliminary) proxy was of the kind that prudent fiduciaries

---

[25] Implicitly, I have already found the action meritorious by granting the Motion to Expedite.
[26] *See, e.g.*, *Grimes v. Donald*, 755 A.2d 388 (Del. 2000) (TABLE).

17

typically disclose. The Defendants have chosen not to contest causation here, however, and it would be unwise to depart from the general rule absent the aid of an adversarial presentation. I assume, therefore, that the Mooted Disclosures were the result of this litigation. In light of the sequence of events, involving little in the way of litigation, the Mooted Disclosures equitably may sustain but a modest award, however.

I evaluate the Plaintiffs' fee request—$500,000—under the well-known *Sugarland* factors.[27] I have considered each of those, but the following adumbration addresses mainly the most important: the benefit conferred.[28] It is, necessarily, a matter of judicial discretion to evaluate a therapeutic, non-monetary benefit of the type conferred here, the effort required to achieve the benefit, and the appropriate fee in light of those considerations. The judge making such an evaluation must be mindful that he serves as a simulacrum for a market, and that his decision will incentivize the amount and quality of litigation that will follow in

---

[27] *See, e.g., In re Plains Res. Inc.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005) ("The factors are: (i) the amount of time and effort applied to the case by counsel for the plaintiffs; (ii) the relative complexities of the litigation; (iii) the standing and ability of petitioning counsel; (iv) the contingent nature of the litigation; (v) the stage at which the litigation ended; (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof; and (vii) the size of the benefit conferred." (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149–50 (Del. 1980))).

[28] *See, e.g., In re Anderson Clayton S'holders' Litig.*, 1988 WL 97480, at *1 (Del. Ch. Sept. 19, 1988).

similar cases;[29] that he must therefore compensate without providing an unsavory windfall; that consistency in awards by this Court is of value, and, again, that expectations reasonably based upon prior Court practice are entitled to equitable consideration.[30]

Here, the benefit achieved via the Supplemental Disclosures (involving banker conflicts) was minor but tangible. While the litigation settled before trial, it was not insubstantial, and clearly produced the benefits discussed. A brief overview of the progress of the litigation follows.

The Merger was announced on December 15, 2014 and the preliminary proxy was filed on January 7, 2015. On January 20, the definitive proxy was filed. Following competing motions and argument, lead counsel was appointed on January 27. On February 5, the Plaintiffs filed their Motion to Expedite; that Motion designated the January 15 Amended Complaint as its operative complaint—that is, a complaint filed before the definitive proxy. I heard argument on the Motion to Expedite on February 13, at which time the Defendants made clear that the majority of the disclosure claims alleged in the Amended Complaint and argued in the opening brief in support of the Motion to Expedite were moot

---

[29] Whether we are setting this "market" efficiently, in light of the near-ubiquity of litigation in connection with public company mergers, remains an open question.

[30] I note particularly recent bench decisions by Chancellor Bouchard. *See Assad v. World Energy Solutions, Inc.*, C.A. No. 10324-CB (Del. Ch. Aug. 20, 2015) (TRANSCRIPT); *In re TW Telecom, Inc. S'holders Litig.*, C.A. No. 9845-CB (Del. Ch. Aug. 20, 2015) (TRANSCRIPT).

because they were disclosed in the definitive proxy. I reserved my decision to consider closely the few remaining non-mooted claims, and decided on February 16 to allow narrow expedited discovery on the nature of alleged conflicts of interest held by Goldman, and the related question of why a second financial advisor was hired and whether that was related to potential conflicts of interest on the part of Goldman. The parties engaged in discovery, including two depositions, as well as document requests which included bank books and Board minutes. On February 26, the parties reached an agreement in principle and the Company filed an 8-K with the Supplemental Disclosures.

This action was brought on a contingency basis, and according to the Plaintiffs the $500,000 requested would represent an implied hourly rate of $712.95 through the execution of the memorandum of understanding. It is my task to set a fee that adequately incentivizes litigation of benefit to a stockholder class, appropriate in light of the benefit achieved and the other *Sugarland* considerations, and consistent, to the extent possible, with awards in cases presenting similar circumstances. In consideration of the modest benefit conferred, albeit after considerable effort, I find that the Supplemental Disclosures merit a fee of $200,000. The Mooted Disclosures, in light of the value to the Class and the minimal effort involved, support a fee of $100,000. Together with costs, I find an

aggregate award of $329,881.61 appropriate. A review of the remaining *Sugarland* factors does not convince me to depart from this determination.

 *D. Conclusion*

For the foregoing reasons, I approve the Settlement and grant the fee request in the amount above. An appropriate Order has been entered separately.